Good morning, Your Honor. Edith Shea for appellants. Just keep your voice up, okay? Yes. Your Honor, the standard of review that was applied by the district court in this case is a question of law, which this court addresses de novo. The MetLife case by the Supreme Court recently confirmed what has been the law, which is that if a plan provides for discretionary authority, an abuse of discretion standard must be applied. Why didn't you stop, waive, et cetera, on that issue? Your company, with every ability and all you smart lawyers on it, said we stipulate that this will be a de novo review. Now, whether something turns out to be de novo in the long run or whether it turns out to be discretionary, don't have facts involved in it very often. You stipulated that it would be de novo. Why isn't that the end of it? Why in the world should we take that up? Your Honor, the reason we don't do that is because we don't have the facts. And let you sandbag the district court by overturning what you agreed to. Two points, Your Honor. First, with respect to why that issue should be considered, even though there was a stipulation. The first, to answer the first question, why this issue of the standard of review should be considered, even though there was a stipulation on that point. The Supreme Court's decision in the Swift case and also in the U.S.B. National Bank of Oregon case makes clear that the fact that there is a stipulation on a point of law is not the court. Is that binding or we're required to ignore it? It's not binding. Precisely. So now that we know it's not, even if it's not binding, why in the world should we ignore what I just said? You folks made a decision to agree it was de novo. We know that de novo use of discretion is not strictly legal. It's also, for example, if you, for example, if your procedural handling of this case was so horrible that we decided you really hadn't done it right, we could review it de novo. We know that. For example, and that's factual. The point is you wanted to avoid a lot of other factual problems and discovery problems and you agreed that it would be de novo review. Assuming we have authority to do it, why in the world should we now upset everything the district court did because you don't like the outcome? Well, Your Honor, what plaintiff has argued is that the prejudice that was in this case was the fact that because of a de novo review, they were unable to obtain information regarding the relationship between Hartford and UDC. The record belies that because Dr. That's not my question. My question is, your having stipulated to it and had decided on that basis why should we exercise, if we have discretion, why should we exercise it to overturn what the district court did in this case? That's the question. Two reasons, Your Honor. It's an ought question. Yes. Two reasons, Your Honor. One, with respect to the court's decision in MetLife, it makes clear that the planned documents that provide discretion must be respected and an abuse of discretion standard must be applied when the plan is applied. You're just saying the same thing all over again. You're just saying that we can do it. Tell me why we ought to do it. In this particular case, Your Honor, with all due respect, I don't believe that the record reflects that this was a decision that was made voluntarily to sandbag plaintiff's counsel or the court. In this particular case, Hartford was faced with a two-day decision as to whether to stipulate to de novo review or abuse of discretion to avoid what would have been an erroneous ruling by the magistrate judge to make Dr. Strang's deposition from the UDC a part of the administrative record. Did you put that particular issue to the district court, that you should not have it de novo because you were forced to have it otherwise? Did you tell the district – did you appeal that to the district court? No, Your Honor, that was not appealed to the district court. Weren't you also trying to protect the confidentiality of your claims guidelines? Pardon me? Weren't you also trying to protect the confidentiality of your claims guidelines? No, Your Honor, not with respect to that stipulation. By the point that the decision was being made with respect to whether there would be a stipulation to de novo review or not, the decision to compel the production of the claim guidelines had already been made. Had you produced them? You're saying that's an unrelated thing? Exactly, Your Honor. That the claims, regardless of whether there was a stipulation to de novo review or not, the decision had already been made that the claim guidelines would be produced, even if there was a stipulation to de novo review. Why should we accept the notion that you were compelled to stipulate before the magistrate, judge? Well, what the record reflects is that at the time – I mean, we're dealing with some, I would think, some pretty sophisticated lawyers who know federal district court, who know the work and know the procedures, and we well know that any discovery ruling by a district court, by a magistrate judge can be appealed to the district judges. So if you didn't think a deposition was proper, you could tell the magistrate judge, go ahead, do whatever you're going to do. We're just going to appeal to the district court. Why? Why was it not appealed? So why, you know, with that option available, it's well known. Why do you expect us to accept the notion that you were compelled to enter this stipulation? Your Honor, it could have been objected to, and it wasn't. Certainly, I'm not taking a contrary position to that. My only point in raising that is simply that under – first of all, under the Swift case, regardless of the reasons why the stipulation was entered into, if the point of law was erroneous, that is the compelling point. Now, the only reason that I raise the issue of how we came to the stipulation was simply because it wasn't simply a strategic move where we offered a stipulation. The circumstances leading up to it, I think, are only significant in that point. This is a contract. Why can't a sophisticated company like yours agree, in this case, Judge, we agree, you can interpret the contract this way. When do these guidelines? Because MetLife doesn't allow for that. MetLife provides that the – that the terms of an ERISA plan govern the judicial – the standard of judicial review. And if the plan documents provide for discretion, as they do in this case, then that's what governs, not the stipulation of the parties with respect to that particular point of law. Let's assume that the Denova standard of review applies to the district court. What's your argument as to why the district court's judgment should be reversed? Several points, Your Honor. First, with respect to the district court's consideration of Dr. Marks's deposition. What the district court did in this case is essentially it held Dr. Marks to a much, much higher standard than what it held the treating physician, Dr. Dyes, to. And it did that in several ways. First of all, it very frankly stated that, and this is at page 59 of the record, that to the extent that a hierarchy could be established, it would give greater weight to the treating physicians because they had been able to see Ms. Rorabaugh's condition over time. First, that's factually, well, not questionable, but it's not a factually strong point because in this particular case, the Dr. Dyes, who was treating Ms. Rorabaugh, had only been treating her for about four months. The other point that's significant in that is that if treating physicians on a hierarchy are going to be placed higher than reviewing physicians simply by the fact that they spend more time with the patient, are able to see the patient's condition develop over time. What do you make of the district court's footnote four, consistent with the ruling in Black and Decker Disability Plan v. Nord, the court has taken only the facts in this case into account in assessing the credibility of the various physicians? I don't think that that takes away from the fact that the district court is weighing these opinions and is creating a hierarchy. And the reason for putting, the reason that whether it's based on the information in this case or whether she's taking information outside the record, the fact of the matter is that in making the determination, she's saying that she's placing the treating physician, she's giving more weight on the scales to the treating physician because the treating physician has that more time. One could look at this and say that by citing Nord, it's a signal that she understood that the treating, in the social security context the treating physician doesn't apply in the ERISA context. She does cite to Nord, Your Honor, but I would, my argument is that what she ended up doing was contrary to Nord, and that if that's going to be a standard that applies, then Nord would be rendered meaningless because in every single case a treating physician is going to spend more time. Let's say that can't be the standard for the reasons you say. Let's say that cannot be the standard. Suppose one said, well, that's sort of a stray comment, the way the judge put it. The judge is really trying to say, for example, was, look, the treating physicians have explored the question of her disability with her. Dr. Marx didn't really even try to do that. He was asked a very specific question. He didn't, the judge just suggested he did something wrong. Let's put that aside. I don't know that he did anything wrong at all. He was asked a very specific question. Tell us whether this person, for example, can do sedentary work. He answered that very specific question, yes. Now, that's not a very, that may not be a very significant answer in light of what the provisions of the policy are. Yes, she can do sedentary work. That only gets you halfway home. Now the insurance company has to take that statement against the treating physicians to say to itself, well, can she do our kind of sedentary work? So you can say Dr. Marx doesn't get you very far. It just gets you to the sedentary work generality. Maybe that's what the district court means. That generality versus the specifics in light of this provision, see what I'm saying? It's not that he did anything wrong, that he's to be denigrated. He did exactly what he should do, and he said she can do sedentary work. And probably she can. Well, but that's not what the district court did. Who said that exactly? I mean, and I think, I don't think it can be characterized as, you know, kind of just a comment or throwaway line, because the court only dedicated two factual findings to this analysis, and this was one of them, that if there's going to be a hierarchy, we're going to put the treating physicians above the reviewing physicians. So that was, and that's just one of the points in terms of how she weighed this, these different decisions. First, she gave no, first of all, she subjected Dr. Marx to a cross-examination with respect to his opinion. So it's not, discovery has been allowed in some cases following this court's precedent regarding the conflict of review issue. Here, this wasn't used for conflict. You know, this wasn't information that Dr. Marx had, you know, how many reviews have you done? Don't you get 80% of your income from Hartford? There was no evidence like that. This was just a cross-examination, an expert opinion cross-examination with respect to his opinions. And then what the district court took from that was she was critical of the fact that Hartford hadn't provided Dr. Marx with the very specifics with regard to what Ms. Rohrabach's duties were. Which is irrelevant for what they asked him to answer. For what they asked him to do. Certainly the treating physician didn't have that. There's no evidence that the treating physician went through and went through all the analysis. What you're asking the doctors to do, they're both neurologists, they're both, at least Dr. Marx is board certified, and what you're asking them to do is say, look at the medical records and tell me what you think the limitations are. Do you think that it falls within here or within here? And then the plan administrator is going to look at that in connection with what the duties are and make a determination, make a determination as to disability. The reviewing physician, as Your Honor has pointed out, is not the one who does that. And that's another very, very stark difference between the manner in which the judge reviewed the treating physician and the reviewing physician. Did you want to say something, Dr. Rohrabach? I did, Your Honor. Okay. Good morning. May it please the Court. My name is Corinne Chandler, and I represent the appellee, Willow Rohrabach. Your Honor, there is no basis for this appeal. Hartford took advantage of stipulating to de novo review, and it did so after this Court's decision in Abatey v. Salta helped. When it elected this strategy, plaintiffs were foreclosed from conducting discovery. Hartford took advantage of the ultimatum, which it characterizes as an ultimatum, but it was not. Given to them by the magistrate judge, it tried the case on the basis of its stipulation, and it lost. Now it contends that the district court should never have accepted the stipulation which it prepared and submitted to it in connection with its opening brief. We request that the Court deny Hartford's appeal. What ground would you ‑‑ is that stipulation binding on us? Is it waived? Is the issue waived? It's absolutely waived. Waived. I believe that it's waived. The Court, in its discretion, can ‑‑ first of all, to answer your question, it was waived for two reasons. It was not appealed to the district court. The court has asked a question whether Hartford appealed the magistrate's ruling to the district court. Actually, it did. It appealed the aspect of the magistrate's ruling regarding its claims guidelines to the district court, and when it did, it affirmatively represented that no other issues from the magistrate's order were the basis of its appeal. It had another opportunity to raise the issue to the district court because we went for another go‑round in discovery battles regarding the confidentiality of its claim guidelines. Again, it was not raised. It was also raised because this court came down with a Beatty v. Alta help in August of 2006. The parties submitted their opening briefs to the district court together with the stipulation to de novo review in September 2006. It could have been raised at that time. It was not. And as far as whether that is a binding stipulation, the court ‑‑ is a mixed question of law and fact. There were issues that caused us to pursue discovery regarding whether Hartford had or could enjoy a grant of discretion. We submitted with our brief in this proceeding a request for judicial notice of two trial court decisions in the central district, which our office handled, that involved the same type of corporate ‑‑ or involved the same corporate transaction that was involved in this case. And that was Hartford's purchase of the block of business from Continental Casualty. And both decisions in those lower courts, DeArca and Babugian, the trial courts found that Hartford could not enjoy the grant of discretion that was given to Continental Casualty. Now, as a result of that ‑‑ of the stipulation, we did not pursue that argument any further. It has to be remembered that the default standard of review in ERISA cases is de novo. It is the defendant's burden to show that they have been granted discretion and if there are delegation issues, that it has been appropriately delegated to them. So there are issues, in fact, here that would preclude, at least under the crimes case that we cited, that would counsel against you exercising discretion. So let's assume that de novo review applies here. Is there ‑‑ what do you have to say about the arguments that advanced this morning? I think that there is overwhelming evidence of disability here. What the trial court found persuasive, there has been an issue regarding whether there was an automatic deference given to plaintiff's treaters. And the trial court went through a weighing of the evidence, which it is supposed to do. It found that Dr. Mark's opinion was not credible for three reasons. First, he used an ‑‑ as Your Honor has pointed out, he used an incorrect occupational standard. He only ‑‑ I didn't say that. Well, only that. I said that he was asked a specific question. That's right. I don't quite see what he ‑‑ I don't understand that part of the district court's opinion, frankly. Okay. I don't see how he, Dr. Mark's, used an incorrect occupational standard. They asked him, can she do any kind of sedentary work? He said, yes. There's nothing wrong with that. Now, she may not be able to do this kind of sedentary work, but they asked him a question and he answered it. That's right. Why is that an incorrect statement on his part? It is not an incorrect response to their question. Correct. Perhaps the better phrase is that they inquired of an incorrect standard. That doesn't make that incorrect either. Doctors do not have to, and very often, as you know since you're in this, very often companies don't want them to give a response on, is this person disabled within the terms of our policy? They just say, you tell us what this person can do. That's all they want from them. That's what this doctor did. He was asked, tell us what this person can do. He said, she can do sedentary work of some kind. She can do some kind of sedentary work. And when they took his depo, that's about what he said. She can do some kind of sedentary work. I don't see that he did anything wrong. He may not have answered the question they would like to answer now, but I don't see how that makes his opinion not credible. It might make it not very weighty in the whole picture. Well, perhaps use of credibility and weighty is what the trial court did here. And she determined that, first of all, he said that it is probable that she could perform tasks at the sedentary level. That was his opinion. He also, his report, the trial court also noted that his report did not discuss the most recent evidence. And, in fact, that was why we took his deposition to begin with. Did he have the most recent evidence? And the court also considered that he never personally examined the plaintiff. And a trial court is entitled to conduct a credibility determination and prefer a treater's opinion over a mere paper review. Well, now the review, well, but that's exactly what the Supreme Court of the State can do. That's the thing that we did in Social Security and the Social Security. The Supreme Court of the State, you can't do that. A paper review is just fine. You can't say treating position gets, just because the treating position seizes the person, that gets more credibility. And it's very dangerous, I think, to do what the district court did. And I can see why you want the district court to do that, of course. You want to get back to NORD without getting into NORD. I do, but you also have to consider if one looks at Dr. Mark's testimony, which the district court did. And, by the way, this is another waiver issue. The appellant never objected to Dr. Mark's testimony at trial. In fact, they relied upon that testimony at trial. They've even relied upon it in this proceeding. So there should be no issue about whether the trial court properly considered Dr. Mark's testimony. He testified that there were certain aspects about plaintiff's jobs that exceeded the sedentary criteria that he utilized when making that determination. The reaching, the sitting two hours at a time, and even his own report, based upon the, quote, sedentary inquiry from Hartford, said that she would have restrictions with repetitive movements with her left arm. The medical evidence is undisputed that she has tremors with her left arm. She has Parkinson's disease. Her job required 100% finger dexterity to type and use office equipment. This was a pretty quick Parkinson's diagnosis, though, wasn't it? This was. Ms. Rohrbach initially went on disability because of back surgery. She did not recover as anticipated, and she was referred to physical therapy. The physical therapy notes documented a decline in her condition instead of improvement. The physical therapist noted the tremors, the cogwheeling of the arm, the stiffness of the gait, and her deterioration. And finally, physical therapy was discontinued until she went to a neurologist. I am not a medical expert, and I have no idea whether back surgery can unmask a condition that is dormant or whatever, but there was no question that she, in fact, when the neurologist first saw her, the first purpose of the inquiry was to rule out whether she had a stroke. And it was determined she didn't have a stroke. She had Parkinson's disease, and she experienced these symptoms. Unless the Court has any further questions? Thank you. I said I'd give you a minute for rebuttal. I think I only had 42 seconds. That's all right. I'll throw in a few extra for good measure. Two very short points. One, with respect to what the district court did with respect to Dr. Marks' decision, I'll just point the Court's attention to the record at page 58, where the Court specifically says Dr. Marks used an incorrect occupational standard. Plaintiff also focuses on a job description from years before that said that Ms. Rorba had to sit for two hours at one time, and that's contrary to what she explained to Hartford, which was that she was a manager and that her job allowed her to be able to sit and stand and make herself comfortable. With respect to just one final point, and that's with respect to the amount awarded by the district court, the last piece of evidence in this case is at page 640, and it's from Dr. Dye saying that she expected that Ms. Rorba would be able to return to work in July of 2004, and her records were showing improvement and a reduction in her medications. What the Court did without any medical evidence at all in this case was to award benefits not just at the time of the denial, but all the way through December of 2006, and there was simply no evidence before the district court that would support that decision. Thank you. The case is submitted. Our next case for argument is Levennuk v. Aetna Life Insurance Company. Thank you.
judges: Fernandez, Paez, Hogan